**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANNA MEISTER, *Plaintiff*, -against- DAVITA HEALTHCARE PARTNERS, INC. and DAVITA, INC., *Defendants*. | Case No. 21-CV-4245 **COMPLAINT** **JURY TRIAL DEMANDED** |

## NATURE OF ACTION

Anna Meister ("Plaintiff"), by her attorneys, Crumiller P.C., brings this complaint against DaVita Healthcare Partners, Inc. and DaVita, Inc. ("DaVita" or collectively "Defendants" or the "Company"), for discrimination on the basis of gender, pregnancy status and caregiver status, in that Plaintiff's pregnancy and status as a mother directly led to pretextual disciplinary actions and her eventual termination, in violation of, the New York City Human Rights Law, N.Y.C. Admin. Code § 8- 107(1)(a) ("NYCHRL"), and the New York State Human Rights Law, N.Y. Exec. Law § 296(1)("NYSHRL"), and for interfering with her anticipated pregnancy leave in violation of the Family Medical Leave Act, 29 U.S.C. §2601(b)(4) ("FMLA")

## PARTIES

1. Plaintiff is a 40-year-old woman and mother to a three-year-old and six-month old infant.

2. Plaintiff is a former, eligible employee of Defendants as that term is defined in the FMLA, 29 U.S.C.§ 2611(2)(4) ("FMLA"), the New York State Human Rights Law (N.Y. Exec. Law § 292[6]) and is entitled to the remedies of said statutes for purposes of the claims brought in this Complaint.

1

3. Plaintiff worked for DaVita in DaVita's facilities, located in New York, New York.

4. DaVita is a nationally known corporation that provides dialysis treatment to patients.

5. DaVita's World Headquarters is located at 2000 16th Street, Denver, Colorado 80202.

## JURISDICTION AND VENUE

6. This Court has original jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1343.

7. This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. §1367.

8. Venue is proper in the Southern District of New York pursuant to 29 U.S.C. § 1391(b)(2)as it is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9. On November 16, 2020, Plaintiff filed a timely Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging claims under Title VII and the Pregnancy Discrimination Act.

10. Once the EEOC issues a Notice of Right to Sue, Plaintiff will seek to amend this Complaint to include allegations under Title VII and the Pregnancy Discrimination Act.

## FACTUAL ALLEGATIONS

11. Plaintiff has worked for DaVita since October 12, 2015 as a clinical dietician on a team that treats and counsels dialysis patients.

12. In this role, DaVita moved Plaintiff around between a variety of clinics in New York City run by DaVita, including its South Bronx clinic, Waters Place clinic, Haven Dialysis clinic and Melrose clinic.

13. Plaintiff was a faithful employee to DaVita for almost five years, and her commitment and dedication have been recognized by her managers, even garnering her a valued Service Excellence Award awarded by her managers.

14. On March 23, 2017, Plaintiff gave birth to her first child, and then took maternity leave for six months, pursuant to the Family Medical Leave Act, returning to work in October 2017.

15. Upon her return to work in September 2017, DaVita reassigned Plaintiff to the evening shift, 6:00-10:00p.m., even though she had been removed from evening shift duties prior to her maternity leave.

16. In September 2017, upon learning of her reassignment to the evening shift, Plaintiff expressed her dissatisfaction with the schedule change to her then-boss, Facility Administrator Rishi Lilly, and the Regional Operations Director, Marin Blitzer, explaining that she had a six-month-old baby at home. Lilly and Blitzer responded that the clinic's needs were inflexible and that once the Company found another solution, she could be taken off evening shifts.

17. In the meantime, however, Plaintiff was forced to balance her parental duties with working the evening shift, which she did for the ensuing approximately eight months.

18. In or around April 2018, Defendants moved Plaintiff off of the evening shift and back to her regular schedule.

19. Plaintiff continued to work for DaVita and received positive evaluations and feedback from her managers. For example, in her 2018 review, Plaintiff's manager, Facility

Administrator Rakesh Ramsaywack, wrote: "Anna [Meister] is a team player, and participates in things for Melrose even when she is offsite"; "Anna takes initiative to do fun activities for the patients"; and "Anna is doing her part in Supporting [*sic*], explaining and instructing patients and patient's family (significant other, care partner, etc.) regarding the nutritional modifications needed to achieve optimum health status."

20. Following this review, Plaintiff was promoted to "Registered Dietician II" and received an accompanying salary increase.

21. In January 2019, DaVita altered Plaintiff's schedule again and split her work weeks between three different clinics: Melrose, Waters Place and Haven.

22. Eventually, DaVita transferred Plaintiff to work full-time at the Melrose clinic, working one day a week from home.

23. At the end of 2019, Plaintiff received another positive evaluation and was told that shemet expectations.

24. In late February 2020, Plaintiff discovered she was pregnant with her second child.

**The COVID-19 Pandemic**

25. In early March 2020, the COVID-19 pandemic broke out in New York.

26. As DaVita constitutes an "essential business," the Company mandated that its employees continue working and seeing patients in person, except for physicians, who were allowed to work from home.

27. DaVita treated patients suffering from COVID-19.

28. DaVita employees working with patients in-person were at an increased risk of exposure to COVID-19.

29. On March 13, 2020, Plaintiff's son's daycare center notified her that they closed because of the pandemic.

4

30. Plaintiff immediately advised her supervisors of the closure of her son's daycare center and asked whether an accommodation could be made for her so that she could work from home.

31. Plaintiff's work as a dietician did not require any in-person interaction with patients, and she could perform all her job duties by way of DaVita's Telehealth system.

32. In fact, Plaintiff had previously worked remotely at DaVita without issue, and other employees at the same DaVita facility were permitted to work remotely.

33. Many dieticians in the New York metro-region also worked remotely during the COVID-19 pandemic since their patient interactions did not need to be done in person.

34. It is industry practice for companies specializing in dialysis treatment and/or other healthcare organizations to allow their dieticians to work remotely and counsel patients via Telehealth. This is because the great majority of a dialysis dietician's work can be done over video-conference and/or on a computer, including counseling patients, writing monthly notes on all patients, annual assessment notes, reviewing patient outcomes and communicating with doctors through secure messaging.

35. DaVita allowed other employees to work remotely during the pandemic, including nephrologists and physicians who worked via Telehealth.

36. Indeed, DaVita even required some of Plaintiff's duties – such as communicating withdoctors at other facilities – to be done via video-conference because of the pandemic.

37. Defendants nonetheless denied Plaintiff's request to work from home, claiming that they were not equipped for her to counsel patients by Telehealth and telling her that she would have to continue coming to the physical workplace.

38. Since Defendants refused to allow Plaintiff to work remotely, she was forced to take an unpaid leave of absence, from March 22 through March 30, 2020.

39. At the end of her leave, Plaintiff requested an extension under New York Paid Family Leave ("PFL"), which provides paid family leave to parents who need to take time away from work to bond with and/or care for their children.

40. On April 10, 2020, Defendants denied this request.

41. As such, Plaintiff then requested to work part-time or partially remotely so she could carefor her three-year-old son.

42. A few days later, the Company again denied her request for childcare accommodations.

*Plaintiff Discloses Her Pregnancy to Defendants*

43. On April 16, 2020, Plaintiff met with her OBGYN for a checkup on her pregnancy as she was experiencing symptoms of fatigue and morning sickness.

44. Plaintiff asked her OBGYN whether there would be any risk to the fetus if she was exposed to COVID-19 at work.

45. Plaintiff's OBGYN informed her that there would be an increased risk of complications to her and her unborn child if she was exposed to COVID-19.

46. Plaintiff's doctor suggested that Plaintiff request to work remotely. Plaintiff's doctor also suggested that if Plaintiff could not work remotely full-time, she at least request to work remotely part-time to lower her risk of exposure to COVID-19.

47. Thus, a few days later, on April 21, 2020, Plaintiff emailed her manager, Ramsaywack, requesting based on her doctor's recommendation, that she be allowed to work remotely whenever feasible because of her pregnancy.

48. Plaintiff then had a conference call with her manager, Ramsaywack, Regional Operations Director Sumeet Rana, and Group Facility Administrator Tamisha Prentice.

49. On this call, Plaintiff disclosed she was pregnant with her second child and that she was very concerned – again, based on her doctor's advice – about putting herself and her unborn fetus at risk of contracting the COVID-19 virus while providing dietician services in person during the pandemic.

50. In response, Rana stated: "You signed up for this when you started working in healthcare," and denied her request to work from home, full-time or part-time.

51. Rana also told Plaintiff that she could not apply for this accommodation with Human Resources.

52. Defendant Rana told Plaintiff that the company offered back-up childcare. But because the childcare was for just ten days, it would cover a small fraction of her pregnancy.

53. Rana then told Plaintiff that she had a choice: she could either return to work full-time starting the next day or resign.

54. Plaintiff was appalled by DaVita's refusal to even consider her request for an accommodation for her pregnancy during the pandemic.

55. Plaintiff, with a young child and another on the way, could not afford to lose her job, and on April 22, 2020, returned to work.

56. After returning to work, Plaintiff continued to struggle with childcare and on a few occasions in May and June, during the height of the pandemic in New York, she arrived late to work.

57. On May 4, 2020, Plaintiff requested another possible accommodation for her pregnancy, a reduced schedule of 35 hours per week instead of 40.

58. The reduced schedule would have allowed Plaintiff to fill in gaps in her son's childcare.

59. In addition, Plaintiff became very fatigued during her pregnancy and a reduced schedule would have allowed her to get more rest.

60. Defendants again summarily denied Plaintiff's requested accommodation.

61. On or about July 22, 2020, Plaintiff discussed her increased patient caseload, or census, with her manager. At that time, she was the covering dietician for two clinics – Melrose and South Bronx – with a total of 150 patients, while a full-time dietician's usual patient census is 120-130 patients.

62. Already overwhelmed from being pregnant and needing to come to work in the midst of a pandemic, the gaps in her childcare coverage, and Defendant's refusal up to then to provide any assistance, Plaintiff desperately hoped that Defendants could at least relieve her of some of her exceedingly large caseload.

63. Plaintiff's manager, Ramsaywack, informed her that the team was looking for another part-time dietitian to "help" her. However, this "help" never came, and Plaintiff continued covering two clinics and a total of 150 patients, with no additional compensation or accommodations from Defendants.

### DaVita Discriminatorily and Retaliatorily Terminates Plaintiff's Employment

64. A few weeks later, on August 5, 2020, Plaintiff received a FaceTime call from a former DaVita employee while she was at work.

65. Plaintiff was walking from her personal office to the waiting room when the former colleague asked how her former patients were doing and stated that she knew a few of them had passed away.

66. In response, Plaintiff disclosed the identity of one patient who had died, which was a matter of public record.

67. Plaintiff then asked two patients who were in the waiting room whether they wanted to say hello to the former employee, and they said yes.

68. A colleague of Plaintiff's was present during this brief interaction and reported to Ramsaywack what he had witnessed.

69. Immediately after the incident, Plaintiff apologized for taking a personal video call while at work. Ramsaywack said he understood that Plaintiff meant no harm and directed her not to answer personal video calls from this former colleague while at work in the future.

70. Two days later, Ramsaywack summoned Plaintiff into his office and informed her that he was giving her a verbal warning for the FaceTime incident and reiterated again that, while Plaintiff had done no harm, having her patients in the background of her personal FaceTime call with her former DaVita colleague might be a possible breach of HIPAA.

71. As such, Ramsaywack told Plaintiff she would have to take a training on HIPAA policies, something which she readily agreed to do.

72. Upon information and belief, Ramsaywack submitted details of the possible HIPAA breach to DaVita's Compliance Department.

73. A few days later, Plaintiff received a call from the Compliance Department to discuss the incident.

74. Upon information and belief, after speaking with Meister, DaVita's Compliance Department recommended disciplining Plaintiff for the possible HIPAA breach, but did not recommend that Plaintiff be terminated.

75. Plaintiff followed up with Ramsaywack the following week to ask when she could schedule her HIPAA training, but Ramsaywack did not respond to her email.

76. On August 21, 2020, several days after the August 5, 2020 incident, without any further discussion, Ramsaywack summoned Plaintiff to a meeting with Sharon Talbot, another facility administrator, participating by phone.

77. Ramsaywack handed Plaintiff a letter stating that her employment was terminated effective immediately.

78. When Plaintiff asked why she was being terminated, Ramsaywack responded that it was because of the HIPAA violation.

79. Plaintiff was shocked and told Ramsaywack that she did not understand in what way she had violated HIPAA, and why she was being terminated rather than trained on HIPAA policies as previously planned.

80. Ramsaywack did not respond to her questions, but rather told Plaintiff to pack up her belongings and immediately leave the premises. Plaintiff complied, and Ramsaywack walked her out of the building.

81. Given that at the time of her termination, Plaintiff was six months pregnant with her second child, and had taken a six-month FMLA leave after the birth of her first child, DaVita reasonably anticipated that she intended to take FMLA leave after the birth of her second child.

82. Defendants terminated Plaintiff to avoid having to maintain her employment while she took an extended pregnancy-related FMLA leave.

*DaVita's Unlawful Discrimination and Retaliation Impacts Plaintiff*

83. DaVita terminated Plaintiff's employment and benefits, including medical coverage, effective immediately.

84. At the time of her termination, Plaintiff planned to take FMLA leave starting on November 20, 2020.

85. When Plaintiff's employment was terminated, she was devastated. What was supposed to be a special time for her and her growing family was now riddled with the anxiety and stress of finding a new job with two children under the age of four years old at home.

86. Plaintiff felt especially betrayed by Defendants given how hard she had worked for DaVita –working long hours with an outsized patient caseload throughout the COVID-19 pandemic, suffering silently through pregnancy-related symptoms, without sustainable childcare, and missing her toddler's doctor appointments and other key milestones.

87. As a result of Defendants' unlawful and discriminatory acts and omissions enumerated herein, Plaintiff has suffered irreparable injury including monetary damages, mental anguish and emotional distress.

### FIRST CAUSE OF ACTION:
**FMLA Interference**
*Against Both Defendants*

88. Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

89. Defendants improperly interfered with Plaintiff's request for FMLA by terminating her employment prior to her taking her entitled FMLA leave.

90. Defendants' discriminatory acts caused Plaintiff to suffer economic damages, including lost wages, commissions, and benefits, as well as emotional and physical distress.

91. Defendants acted with malice and/or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

92. Therefore, Defendants are jointly and severally liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

## SECOND CAUSE OF ACTION:
### Discrimination in Violation of the NYSHRL
*Against Both Defendants*

93. Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

94. Defendants improperly discriminated against Plaintiff in the terms and conditions of her employment by denying her a reasonable accommodation on the basis of her pregnancy, and improperly terminating her employment on the basis of her gender, pregnancy and caregiver status in violation of the NYSHRL.

95. Defendants' discriminatory acts caused Plaintiff to suffer economic damages, including lost wages, commissions, and benefits, as well as emotional and physical distress.

96. Defendants acted with malice and/or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

97. Therefore, Defendants are jointly and severally liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

## THIRD CAUSE OF ACTION:
### Retaliation in Violation of the NYSHRL
*Against Both Defendants*

98. Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

99. Defendants unlawfully retaliated against Plaintiff in the terms and conditions of her employment and by terminating her employment on the basis of her protected activities, including, but not limited to, requesting a reasonable accommodation in violation of NYSHRL.

100. Defendants' unlawful retaliatory acts caused Plaintiff to suffer economic damages, including lost wages as well as emotional distress damages.

101. Defendants acted willfully, with malice and/or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

102. Therefore, Defendants are jointly and severally liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

**FOURTH CAUSE OF ACTION:**
**Discrimination in Violation of the NYCHRL**
*Against Both Defendants*

103. Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

104. Defendants improperly discriminated against Plaintiff in the terms and conditions of her employment, and improperly denied her request for a reasonable accommodation and terminated her employment on the basis of her gender, pregnancy and caregiver status in violation of the NYCHRL.

105. Defendants' discriminatory acts caused Plaintiff to suffer economic damages, including lost wages, commissions, and benefits, as well as emotional and physical distress.

106. Defendants acted with malice and/or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

107. Therefore, Defendants are jointly and severally liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

### FIFTH CAUSE OF ACTION:
### Retaliation in Violation of the NYCHRL
### *Against Both Defendants*

108. Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

109. Defendants unlawfully retaliated against Plaintiff in the terms and conditions of her employment and terminated her employment on the basis of her request for a reasonable accommodation, gender, pregnancy and caregiver status in violation of NYCHRL.

110. Defendants' unlawful retaliatory acts caused Plaintiff to suffer economic damages, including lost wages as well as emotional distress damages.

111. Defendants acted willfully, with negligence or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

112. Therefore, Defendants are jointly and severally liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

### DEMAND FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment that:

a) declares that the discriminatory actions, practices, and policies of Defendants as set forth above violated FMLA, NYSHRL and the NYCHRL;

b) awards monetary damages to Plaintiff to compensate her for the discrimination she experienced, including economic damages, and damages for emotional distress;

c)  awards Plaintiff punitive damages;

d)  awards Plaintiff reasonable attorneys' fees and costs; and

e)  grants such other relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to FRCP § 38(b), Plaintiff demands a trial by jury.

Dated: Brooklyn, New York
May 12, 2021

Respectfully submitted,

_____
Hilary J. Orzick
Crumiller P.C.
16 Court St, Ste 2500
Brooklyn, NY 11241
(212) 390-8480
hjo@crumiller.com
*Attorneys for Plaintiff*